WILLIAM AYLETT,
the grandson, was seised in fee simple of a large tract of land in Kingwilliam county, of which part was his dwelling plantation, and other parts were occupied by tenents; was seised in fee simpleof lands in James city, Warwick and Bedford, counties ; — and was intitled to fourteen hundred acres, part of a tract of land, likewise in the county of Kingwilliam, which nad been demised for 999 years, (a) of this term, if the lease were made, as it is supposed, for it is not among the exhibits, to have been made, since the settlement of this country by europeans, perhaps 900 years, or more, remained unexpired, at the rime of his death, for recovering possession of part of the leasehold land, witheld by the husband of John Ayletts widow, or one claming under him, an action of trespass and ejectment had been commenced by William Aylett, the grand *220 son, in the name of his lessee, he died before the trial, after-wards a case, made by agreement, between his representatives and the other party in that action, instead of a special verdict, stating the facts, was argued, and a judgement given, affirming the title of the lessor of the plaintiff; in consequence of which, his executors obtained the possession.
That William Aylett, the grandson, knew his title to the leasehold land to be a term for years only doth not appear, the contrary is more probable, because his grandfather William Aylett, who owned all the demised land, in his testament, calleth it, several times, £ land bought,’ doth not once mention a lease, and, after devising the greater part of the tract to three of his sons, namely, Philip, John, and Benjamin, devised 1200 acres the-remainder of it, to four daughters severaly, and to the heirs of their respective bodies, with remainders in default of such heirs, annexing slaves to every parcel, and, in two of thosedevises, declaring that the slaves so annexed should DESCEND pass and go, as part of the FREEHOLD, and John Aylett, in his testament, by which William Aylett, the grandson, claming under his father, derived the title asserted by the judgement aforementioned, doth not appear to have supposed his title to be less than a fee simple.
William Aylett, the grandson, by his testament, in april, 1780, without taking any notice of a lease, devised in these w< rds : e i give to my son, Philip Aylett/ who is the plaintiff, £ the plantation on which i at present live, and ALL MY LANDS IN KINGWILLIAM, also my land in Drummonds neck, in James city county, to him and his heirs,’ and after devising his lands in Warwick and Bedford to his son William Aylett, one of the defendents, and declaring his will to be, that his wife should hold and enjoy any part of the aforesaid lands, during her widowhood, to employ thereon certain slaves, to be aboted to her, added these words : £ all the residue of my estate, of what kind soever, i -give and bequeath to my wife aforesaid and my children, to be equaly divided among themand died so seised and intitled.
The plaintiff, after he had, by some events not necessary to be now stated, become intitled to the estate devised to him, brought his bill in the high court of chancery, claming the leasehold land, to which his father had been intitled, and praying a decree for the possession and profits thereof.
The defendents, by their answer, objected, that William Aylett, the grandson, had no power to devise the leasehold lands, because he had a right to them only, without the possession, at the time of his death, which bare right, being a chose in action, *221 was said to be not transferable by law ; and, if it were transferable, the defendents insisted that it was not comprehended, in the devise to the plaintiff ; and that the words, ‘ all my lands,’ therein were satisfied by the part of them whereof that testator was seised in fee simple ; and that the leasehold land was included in the residuary bequest to the wife and children.
The cause was heard, on the bill, answer, and exhibits, the 13 day of may, 1793.
The court, in the decree, slighted the first objection, supposing to be indisputable, first, that a chose in action is assignable in equity, and, secondly, that one may bequeath that which he can assign;* and the defendents counsil not urging the objection, or urging it so faintly as to betray a consciousness that it was not maintainable.
Upon the other point, the counsil for the defendents only quoted and applied the resolution, by the court of kingsbench, of the first question stated in the case of Rose versus Bartlett, in trinity term, 7 Car. 1.
The case, to be found in the 292, 3 and 4, pages of reports of cases adjudged during the first sixteen years of the reign of king Charles the first, collected and written in french by George Croke, and after his death revised and published in english by Harbottle Grimston ,was
‘ Ejectione jirmae.oí the demise of John Rose and Elizabeth his wife, of forty acres of land, and two acres of meadow, in Burnham, for three years, upon not guilty, a special verdict was found, that Philip Scudamore was seised in fee of the land in the declaration, anno 44 Elizabeth,’ and by indenture demised it, by the name of four closes of pasture in Burnham, fcr a hundred years, to Richard Batyne ; and that Richard Batyue entered and was possessed, and being so possessed, and seised in fee of other lands and tenements in Burnham, afterwards, viz. duodécima aprilis, tertio Caroli, made his will in writing, which is found in haec verbq: ‘ i will that my wife Elizabeth shall have Burnhams and the lands thereunto belonging, being three half acres in Lentfield. and my will is, if she do marry, my son Nicholas shall have Burnhams, and three half acres lying in Lentfield. item i will my son Bartholomew shall have for his maintenance out of the land 51. yearly, as long as she keepeih herself unmarried, item i will and bequeath to my said wife Elizabeth all the rest of my lands, lying in the parishes of Burnham and Hitcham, during the time of her life, and afterwards to my son Bartholomew, also i make my wife my full *222 and whole executrix of all my cattle, corn, and moveable goods : except such as i have appointed to be sold for payment of legacies,’ prout per le volunt, Sec,, they find that Richard Batyne died, and the said Elizabeth proved the will in the prerogative cotirr, quodque administratio omnium bouorum, jurium ac credit torum dictum Richardum Batyne et ejus testamentum qualitercunq’ coucernenf by the judge of the prerogative court was committed to the said Elizabeth, that she afterwards took to husband the defendent, whereby they were possessed of the said lease : and that the said Bartlett assigned that lease to Richard Hammond, upon the condition for the payment of 30 pounds, at a day certain., who, failing of the payment thereof, reassigned aftenvards that lease to the defendent; that the said Elizabeth died, and afterwards the said Bartholomew died, and that Elizabeth, the wife of Bartholomew, obtained letters of administration dc bonis Richardi Batyne non administraf by Elizabeth the wife of Richard Batyne, who took John Rose to husband, and they let to the plaintiff, and the defendent ousted him, and if,. &c.
This case was argued by Calthorp for the plaintiff, and by Germin for the defendent.
The first question was, whether this lease for years be devised to Elizabeth for life, remainder to Bartholomew? and all the justices (absenta Richardson) resolved, that if a man hath lands in fee, and lands for years, and deviseth all his lands and tenements, the fee simple lands pass only, and not the lease for years : and if a man hath a lease for years, and no fee simple, and deviseth all his lands and tenements, the lease for years passeth ; for otherwise the will should, be merely void.
Secondly, they all agree, that if one deviseth his land, which he hatli by lease, to his executor for life, the remainder over, that there ought to be a special assent thereto by the executor, as to a legacy, otherwise it is not executed : and there was not here any special assent.
Thirdly, Jones and myself were of opinion, that it appears here that he had other lands in fee, which, he devised to bis wife, durante viduitate ; and other lands which he devised unto her, for life, the remainder over, and then that devise may not extend to that lease, but Berkley to the contrary, because it may be that land devised, as long as she is unmarried., is the sole land which he had in fee : and the other land devised absolutely is the lease for years ; but it was thereto answered, that the devise is unto her, for life, of the lands in Burnham and Hitcham, and clearly no part of the lease land extends into Hiteham ; so as it is clear, it extends not to lease lands, but to freehold lands..
*223 Fourthly, Richard Batyne making his wife his sole and whole executrix of all his cattle, corn, and moveable goods, and not mentioning what shall be done concerning the residue of his estate ; whether the wife be absolute executrix quoad all his estate, or only particular executrix quoad his cattle, corn, and moveable goods, and not quoad his leases, and his debts? and as touching that point, we all agreed, that one may make several executors ; the one quoad things real, the other quoad things personal, and may divide their authority ; yet quoad creditors, they are all executors, and as one executor, and may be sued as one executor, !9 II. 8. 8. Dy. fol. 3. 32. H. 8. Br. Exec. 155. but Jones justice and myself conceived, as this case is, that she is sole and absolute executrix lor the whole estate, as well leases as debts, and other things: for when he saith, that she shall be his sole and whole executrix of his cattle, corn, and moveable goods, it is but an enumeration of the particulars, and no exclusion of any, especialy when he doth not make any other executor, for the residue : and entalla in latín extends to all things, audit may be intended, that so was the intent, when he made not any other executor, but Berkley justice conceived, that she is a special executrix quoad the things enumerated, and no general executrix.
The fifth question was, admitting that she is no absolute executrix quoad all the estate, but quoad the particulars specialy named, and she proving the will, and it being found, that administration was committed unto her omnium bonorum, &c. provt antea, whether that be a general administration committed, or only an administration of the goods whereof she was made executrix? and Berkley held, that it is but a special' administration, because it is bonorum, jurium if creditorum praedief Richard Batyne et praedief testament’ concernenf and that coupled to the testament; so that it extends no further than the will, hut Jones and myself were of opinion, that it was a general administration committed; for jurium et creditorum are general words, and the word et should be expounded as aut, and it cannot he tied only to the testament; for there be not any words of debts, as creditorum imports ; and they he as general words, as are useful in general letters of administration ; wherefore upon all the matter, justice Jones and myself were of opinion against the plaintiff, that he should be barred, hut justice Berkley e contra, per quod adjoumatur.,
And the counsil for the dependents in the principal case relied upon the authority of that resolution of the first question in the case cited, which as he thought, favoured the right clamed by his clients, not less than if the case had been, for that purpose,, contrived by himself, and
*224 Thé judge of the high court of chancery, for reasons hereafter assigned, not allowing the authority of the resolution quoted to be more decisive than if the case had been so contrived by the counsil, although that resolution had been quoted in We -tminsterhall half score of times, without disapprobation, and once or twice with approbation, delivered this opinion : ‘ that the plaintiff, by the testament of his father, was intitled to the leasehold land clamed by the bill, but that the said land was subject, as a specific legacy, inpayment of that testators debts -* and the court decreed the defendants, who were executors, to deliver to the plaintiff possession, and to account with him for the profits, of the said leasehold land, upon hL entering into' bond, with surety, for payment of his proportion of those debts to which a specific legacy is liable.
In justification of this opinion and decree, what followeth is submitted to censure.
A man, not acquainted with law cases, to whom, after reading the testament of William Aylett, the grandson, and being informed of the facts before stated, was propounded the question, whether Philip Aylett, the devisee, was intitled to all his fathers lands in the county of Kingwilliam, and, among them, to the lands which he had aright to hold for 900 years only? after recovering from the surprise, which a controversy upon sucha devise, in which doth not occur an ambiguous sentence, an equivocal word, or a technical term, must occasion, would probably not haesitate to answer the question affirmatively, if he did not think it too trifling to be asked or answered, observing that the fee simple lands and the leasehold lands both were the testators lands, although one were his for an indefinite time, and the other were his for a definite time ; — that by the complexion of the testament, he, who made it, seems to have intended to divide all his landed property between his two sons, and out of his other estate to raise portions for daughters, which is the most usual mode of provision for a family of children ;— and that the presumption in favor of the devisee Philip is the stronger, if the testator knew not that his title to the leasehold land was less than a fee simple, he would probably have observed further, if the testator had said, ‘ i give to my son Philip Aylett all my lands freehold and leasehold,’ the terms ‘ freehold and leasehold’ would not have been any thing more than enumeration of the species, whereof lands was the genus; and that a devise of the genus includeth all its species, and that if William Aylett, the grandson, had been seised moreover of lands holden for the life of another, where the cestuy que vie survived the testator, these lands would have been compre *225 hended in the devise, as well as those holden in fee simple, and for term of years, because included equaly in the generical term.
A -man, not altogether unacquainted with law cases hut, emancipated from a servile obsequiousness to the authority of adjudications in some particular instances, to whom was propounded the same question, in verification of the affirmative answer to it, will endeavour to shew the only true meaning of the devise in the testament of William Aylett, the grandsou, to the plaintiff to be, that he should have the leasehold as well as the lee simple lands in Kingwilliam county, and that, in such a ease as 'this, authority ought not to prevale against that intention.
I. The true Interpretation of the devise will appear from these considerations.
1. Translation, ex vi termini, imports motion, and consequently change of place, for philosophers, of whom some have attempted to define motion, and others have denied motion to be defineable, however they differ in that, have ail agreed change of place to be either an essential part, or a necessary concomitant, of motion, and, if to moral entities we may, by analogy, attribute place, which naturaly signified} the part of space occupied exclusively by a body, dominion, right, property, may, when it is transferred, be said to change place, i. e. to change the owner.
2 Translation of dominion, right, property, by testament, is perfect, at furthest, so soon as the devisee or legatary consented} to accept the subject devised or bequeathed, (b) and according .to the opinion of some,-at the death of the testator.
3. If the place of the subject transferred be changed, by the transferring act, and the translation be perfect, so soon as the subject of it is accepted ; the subject transferred is not the thing in which the dominion, right, property, is exerciseable : for the place of the land, if that be the thing, is not changed ; the slave, horse, piece of furniture, garment, library, philosophical apparatus, if that be the thing, may remain where it was, and yet the dominion, right, properly, thereof may be perfectly transfered, — the place of the dominion, right, property, may be changed, so that,
4. When one saith, he deviseth land, or bequeaths any other thing, the terms are eliptical ; some words are left out which are understood ; and, in such a case, the testator must mean that the devise or bequest shall have, not a sensible immediate- operation upon the land or other thing said to he devised or be-- *226 que»thed, but a mystical operation on his dominion, right, property, over, to, in, the land, or other thing.
Thus Justinians compilers, Brae ton, who followed their method, and other exact writers, intitule their tractates upon, such subjects de acquirendo reruin DOMINIO. *
He, who may incline to ask, by way of objection to what is-here stated, do men never on such occasions, speak or write,, without'shrouding, by a figure, half of what they mean, is desired to consider the quotations in the note, (c)
Some may ask too, if translation in general do not operate immediately upon the thing said to be transfered, what, in the particular cases of a feoffment of lands, and a gift of moveable-goods, do livery of seisin, in one, and tradition, in the other, mean? to which- question the answer is, those ceremonies are-images of the transition of dominion, right, property ; — possession of a thing is presumptive evidence of the possessors dominion, right, property ; delivery of the possession is a symbol' representing a change of the dominion, right, property,
5. The most unerring mode of interpreting a testament, the-terms of which are supposed to be equivocal or ambiguous, is by inserting the words necessarily understood :
For example : in this case where the testator, who had one-tract of land, holden in foe simple, and was infilled to another tract of land, holden for term of years, both tracts in Kiugwiiliam county, devised all his lands in Kiugwilliam to his son Philip Aylett, the man, whose wonderfull sagacity enabled him,, after diligently exploring the devise, to smell or spy out in it an equivoque or an ambiguity, would perhaps admit that it vanished, if the words right to, which are proved to be necessarily under *227 stood, were supplied; with which supplement the devise would be read thus : ‘ i give to my soil Philip Aylett till my right to lands in Kingwilliatn : in which case,
6. That the devisee would have been iutitled to the leasehold lands in question, as well as to the ibe simple lands, is affirmed, with confidence, because the c inclusion is believed to be undeniable, and, if so, the decree was correct, hut
It is said to he proved, by authority, that is by the forernenfioned case of Rose versus Bartlett, to be erroneous ; and truth, reason, justice, and indisputable principles of law, conspiring together, will sometimes no moie enable a demand to stem the torrent of authority than a lair wind, aided by concurrent tides, will be able to drive through the syrtes the bark

Illisam vadis atque aggere. cinetam arena..

IT. On this part of the case, observations will tend to shew
1. That judicial determinations of questions not legal in their nature, although they must, so long as they remain unreversed, be definitive in the cases wherein the questions were necessarily discussed, and determined, ought not to bo precedents of derisive authority, when similar questions occur in other cases, •if judges in the latter discover the determinations in the former to have been erroneous.
2. That a false judicial interpretation of one mans testament, if the words be not law terms, of a meaning in that science different from their meaning in ordinary discourse, ought not to be a precedent authorising a like interpretation of like words in the testament of another man.
2. That the case of Rose versus Bartlett is not a precedent of decisive authority in this ease, if in any other.
1. That questions, which cannot be called questions of law, are frequently brought before courts oí judicature the experience of every day sheweth.
The determinations of such questions by those courts ought not to be precedents of decisive authority, unless every judge of them were equal to the man whom Juvenal describes, Sat. 111 v. 77. (d) — unless every judge were such a prodigy of genius and learning as the man, hight c the admirable Crichton,’ who, inviting all the literati, whithersoever he went, to dispute with him, and undertaking to answer rightly every question, which could be propounded, in any art or science, and in any oí twelve languages, and this either in verse or prose, at the choice of the antagonist or querist, is reported to have astonished the auditories at all the trials by proving himself not to be a vain boaster.
*228 But such phaenomena are less frequent than comets., (e) and therefore the authority of sentences by judges of law, who certainly are not always perfect adepts in every science, may be,, in many cases, disallowed by their successors, if these, better informed, discover the sentences to be erroneous. And this, the euglish judges scruple not to do, even in cases where the questions were purely legal, as well as in other cases.
If a man had devised a tract of land, on one side of a determinate line, to be laid off in a triangle, of which the other sides, should be such that the sum of their squares should be equal to the square of the given line ; and if any court had determined upon such a devise that the angle subtending the hypotheueuse should be an oblique 'angle; ought that determination to authorise a similar sentence in another case, where the same question occurred, although, in discussing the latter, should be demonstrated, as may be demonstrated', that the angle, which alone can answer the conditions of the question, is a right angle ?
If such a dispute as Archimedes rightly decided between Hiero, king of Syracuse, and the mechanic, who was accused of pilfering some of the gold delivered to him for making a crown, and of supplying the place of what was withdrawn by baser-metal, coming before courts of law had been determined by a mode known to be fallible ; would not a court of law now, disregarding any number of those determinations, resort to the-hydrostatic experiment, which is infallible9
In adjusting the proportion, which a tenent for life ought to have, of the purchase money, for which an estate of inheritance should be sold, would a court, at this day,-regard the rules observed in such cases by the courts formerly, or have recourse to the problems and tables invented and formed for that purpose by the accurate Demoivre, Halley or Price ?
lu a question concerning the legitimacy of a posthumous child, which is a ph)rsiologicai question, depending upon the time of birth after a husbands death, ought a court to regard the authority of opinions, by which former judges of law had limited *229 the time of gestation, so much as the opinion of Hunter, the eminent anatomist and accoucheur?
If the mother had takéu another husband, so soon, after the death of a former, that the child might have been begoten (f) by either, would a court at this day, permit the child, even if authority could be produced (which seems, by (Jokes com. on Lyt. fol. 8. b, not imposible) for permitting hi n, tochuse his father? (g)
Fór nerly, no proof of any thing, less than impossibility of procreation, see.nei admssible to bastardize a child, who was born in wedLock, if he migrt have been begoten, whilst the husb md was infra qratnor for this uumberless author-
ities are extant, and some of them later than the determination of the case between Rose and Bartlett, do courts at this time abide by those authorities?
In Brookes abridgement-, title administer, n. 47, in Swinburnes treatise of testaments-, part 7, sect. 8 and in the life and opinions of Tristram Shandy, gentleman, vol. 4. p, 195, we meet with the case stated in the nóte. (h)
*230 This case, in Cokes third book of rep rts, fol. 40, is indeed denied to be law; because it is erroneous ; ai.d, for the same reason,
2. The interpretation of a devise in one mans testament, if the interpretation be erroneous, ought not to be a precedent authorizing a like interpretation of a like devise in another mans testament.
When a court of law misinterprets a devide, a sentence, m conformity with that false interpretation, depriving one of an estate, is no less contrary to law, than the sentence which deprived a mother of her right to an estate, upon the false principle, that she was not of kin to her own child.
In neither case was the question merely legal, in the case of the devise, where no technical term occurred, the question, was purely philological.
The court is as miich bound to fullfill the intention of a testator, according to the meaning of his own words, as to grant the administration to the next of kin.
A court of law, who, interpreting one mans words in his testament, about the meaning of which no man could have entertained a doubt, if similiar words in the testament of another man had not been misinterpreted by another court upwards of 160 years before, should be guided in their determination by the authority of such a false interpretation, are affirmed to determine contrary to law, — affirmed with the more confidence, because the law doth not presume the testator to know of such misinterpretation, but, on the contrary, presuming him to be inojps consilii, directs the judges to interpret his words according to what they believe to bo his meaning by them, upon the supposition that he is without the aid of those who could inform him of judicial sentences, by which similar words had been misinterpreted.
Indeed recurrence to authorities in questions upon the meaning of testamentary dispositions seems improper in most cases, where terms of art do not occur.
3. If a painter, who had been desired to draw the picture of William Aylett, hearing that he resembled one Richard Batyne, *231 should inquire after the latter, draw his picture, and present it for William Ayletts, most people would think the painter acted absurdly, and more absurdly, if the likeness which he took of Richard Balyne was not a faithful likeness, when the defendenls consil rummaging in his reperlorium juririicum, his lumber room of law cases and authorities, found a judicial interpretation oí some words in Richard Batynes testament resembling the words in William Ayletts testament, and recommended an adoption of that interpretation in the principal case, the judge of the high court of chancery thought, if he had adopted the interpretation recommended, which appeared to him false, ho should have determined contrary to law, and have acted not less absurdly than the painter ; for the interpretation of tire testament ought to be as true an image of his intend -n who made it, as the portrait ought to be of him for whom it was drawn : more especially if the case of Rose versus Bartlett bo not only contrary to law, as it is clearly proved to be, but, for otlior reasons, to be explaned hereafter, ought not to have the weight of an authority.
Some judges and many lawyers revere authority so much, that they seem to believe nothing, which hath that sanction, to be wrong, and scarcely any thing, which wants it, to be right, and appear to be displeased with those who have not the same kind of implicit faith.
Several years ago, in a case between Parsons and Parsons, where the question was upon the interpretation of a devise, tire chagrine of the plaintiffs cmmsil, occasioned by the courts judgment, which lie thought contrary to some authorities produced by him, broke forth in a declaration that, so soon as he should return home, he would bum all his books of reports, such au holocaust might have been an offering not altogether acceptable to Astroa ; because of the reported cases are many exceeding valuable, better would have been an imitation of Prometheus, who is said to have taught men, in sacrifices, to consume on the altar the entrails and offal, that is, the vile parts of victims, and to regale themselves, in jocund festivity, with the dainty parts.
Of the reports more in proportion might be spared than the barber and curate saved from Don Quixotes library ; out of them, well winnowed from the chaff accumulated with them, a body of civil law may be limned, equal in value with the code, pandects, institutes, and novels, which were ushered into the world with imperial auspices.
Ameritan judges may contribute to such a desirable compilation ; and will not have to encounter the prejudices, and to *232 struggle against the difficulties, which must occur in England, and retard a reformation of that part of the law, which is said1 (Co. instit. part 1, fol. 344,) to £ consist of reports and judicial records many of which reports english judges acknowledge to have been ill founded.
But how can this be- done by american judges", if they may not reject those cases in the reports’, which are- contrary to law,, or not reject them, before they shall have been reprobated by english judges ? if the-case-of Suffolk had not been denied by english judges, must it have-been admitted by american judges to be law? in return for this deference by american judges to english authority,.how would english judges respect american authority? the resolution of an american court, quoted in Westminster hall, if aroycounsil there1 should venture to expose himself to ridicule, perhaps to rebuke,, by the-quotation, would, no doubt, be treated, if not with fastidious neglect,- like a * sus Minervam.
The judge of'the high court of chancery, not supposing-himself to be in such a humiliating predicament, as- that he must wait for leave from english judges, before he can venture, to reject au english determination, '
III. Denied the authority of the resolution in- the case of Rose versus Bartlett, upon which the- defendents counsil in the principal case relied.
That it is contrary to law is believed to have been proved.
Upon that, and other parts of the case, to shew that it ought not to be respected, are observed,
1. The former part of the resolution of the first question is a dogma, merely didactic, imperious and arbitrary, for which no reason is assigned ; and the reason given for the other part of it, alLowing leasehold lands to pass by a devise of alt his lands, where the tes tutu- had only leasehold lands, seems auk ward. — • the reason given is, £ for otherwise the will would be merely void.’ instead of which most other men would have given this obvious, as well as true reason, why the leasehold lands should pass to the devisee, £ that they were devised to him.’
Again ; a case might have happened in which this resolution might have been au authority oil either side of the question, and with equal force, if a man, who had lands in fee simple and lauds for years, had devised all his lands to him who was heir at law of the testator. (i) the devise, without doubt, would have been void as to the fee simple lands, because they would *233 have descended, and therefore could not have passed by the devise to the heir, here then might have been urged, on one side, the leasehold lands should pass, because ‘ otherwise the will would be merely void ;’ on the other, that the leasehold lands should not pass, because ‘ the testator had fee simple lands,’ as well as leasehold lands (k)
2. The special assent of an executor, to whom a term for years was devised, with a remainder over, in order to execute the remainder, seemed not necessary, as the court resolved it to be in the case quoted, if some facts stated in the special verdict he properly considered.
3. On the third question the judges differed in opinion ; yet it seems included in the first question, on which they were unanimous.
4. One question in the case was this : Richard Batyne making his wife whole and sole exccutnx of all his cattle, corn, and moveable goods, and not mentioning what shall be done concerning the residue of his estate, whether the wife be absolute executrix quoad all his estate, or only particular executrix quoad his cattle, corn, and moveable goods, and not quoad his leases and his debts? in discussing which question, two of the judges, in order to prove the wife to have been, not a special, but a catholic executrix, used one argument, in these terms: catal!a,in latin, extends to all things, turning the english word ‘ cattle’ in the testament, which signifies gregarious quadrupeds, into a latin word which may include a lease of land for years, as happy an expedient as any of those which occurred to Peter, Martin, and Jack, in Swifts tale of a tub.-
5. The case doth not appear, by the report of it, to have been fiualy decided, and so cannot he said transisse hv rem judicata rn ; for it ends thus : ‘ wherefore upon ALL the matter justice Jones and myself were of opinion against the plaintiff that he should be barred, but justice Berkeley ‘ contra, per quod adjournatur. ’
For these reasons the judge of the high court of chancery, rejecting the clumsy, bungling, unfinished case of Rose versus Bartlet;, as he thought it, made the decree, which he believed exactly corresponded with the' meaning of William Ayletts,/ words, inquisitive to discover that meaning from those words, *234 couvinced that they only ought to be consulted for discovering it. (l)
But he was mistaken, as it seemeth, for the court of appeals, before whom the decree in the principal case was impeached, on the 12 day of march, 1795, delivered this opinion : £ that the testator appearing to have freehold lands in the county of Kingwilliam to satisfy the devise to his son Philip of all his lands in Kingwilliam, the leasehold lands in question did not pass thereby, ACCORDING TO THE UNIFORM DECISIONS ON THE SUBJECT, but passed in' the residuary estate devised to the wife and children of the testator, and that there is error in the said decree,’ and therefore reversed the said decree.
Upon the reversing decree the writer of the prolusions to it will make one remark, and to it subjoin one question.
The remark is : the terms £ uniform decisions,’ that is, decisions in England, suggest a powerfull argument in favor of a different decision in Virginia, if the first euglish decision were erroneous, as it is affirmed to have been, in that country, if many and uniform, decisions have established the doctrine, although it be unsound, defendit numerus. but in the principal case, if it be the only instance (and for any thing appearing to the contrary it is the only instance) in which any man ever thought whether a devise of the whole, was satisfied by part, of a thing? to be a disputable question, the precedent here ought to be the reverse, as is conceived, of that in England.
The question is : when a man, who had two tracts of land in Kingwilliam county, devised all his lands in that county, *235 that is, both the tracts, to his son Philip Aylett, and when that devise is satisfied with half his lands ; that is with one of the tracts, in Kiugwilliam county, this doctrine being established ; whether, when the same testator devised ALL the residue of his estate to his wile and children, the devise of ALL there was not satisfied, as in the other instance, with one HALF of the residuary estate ; in consequence whereof the wife would, have been intiried to one sixth of one half, and to one third of the other half, that is to throe twelfths or one fourth part, of the residue ?

 This terrier is taken from the answer of the defendents.

 [Mr. Green has here referred to Free, in Chan. 142, Blake v. Johnson. — Ed.]

 See Rutherforth on Grotius b. 1. c. VI. s. V.

[* Mr. G. here refers to Plowd. 448. — 23Ed.]

 ‘ The first aim of language is to communicate our thoughts; the second,, to do it with dispatch, the difficulties and disputes concerning language have arisen almost i.itirely from neglecting the consideration of the Tatter purpose of speech, which, though subordinate to the former, is almost as necessary in the commerce of mankind. words have been called vnnged; and they well deserve that name, when their abbreviations are compared with the progress which speech could make without these inventions; but, compared with the rapidity of thought, they have, nut the smallest clame to that title, phllos >phershave calculated the difference of velocity between sound and light, but who will attempt to calculate the difference between speech and thought? what wonder then that the invemion of all ages should have been opon the stretch to add such wings to their conversation as might enable it, if possible, to keep pace in some measure with their minds.’ Epea pteroenta, or the diversions of Purley, by John Horne To-ke, who, in a note there, hath transcribed from m le Presidente de Brasses, these pertinent words : L’esprit humain veut aller vite dans son operation; plus empressé de s’exprimer promptement, que eurieux de s’exprimer avec une justesse exacte et reflechie. s’il n’a pas 1’instrument qu’il faudroit employer, il se sert de celui qu’il a tout prét.

 Grammaticus, rhetor, geometres, pictor, aliptes, Jdugur, schoenobates, medicus, magus ; omnia novit.

 Quintilian, who would have a youth, intended to he an accomplished orator, to be insiructed in the arts (and what he supposeth necessary to the orator must be no less necessary for qualifying a judge to decide rightly questions of every kind which may be discussed before him) so ut efficiulvr orbis Ule doctrínete, quam graeci eneyclopaediam vacant, expected seme might ask, quid ad agendum causam, dicendamve sententium, pertinet scire quemadmodum in data linea constituí triangula acquis lateribm possint f ant quo melius vel defendet ream vel regel consilia, qui citharae sonos nominibus el spatiis distinxerit ? to whicti he answers thns: non eum a nobis inslitui oratormn, qui 811’, aut FTJE-R1T, sed imaginem quondam concepisse nos animo perfccti illius, ex nulla parte eessantis.

 This might have happened in the case of her, who, returning from the interment of her husband, toM a wooer, resolved to apply early enough as he thought, that he was to> late; and in the ease of the ephestan matron who, as her story is related or pernapS invented by Petronius, to save a living husband, in danger of capital punishment, for neglect of duty, whilst lie dallied with her, in watching the corpse of ofle, who had been gibeted, contrived to make a dead husband supply the place of the malefactor, stolen away by some of his friends in the guards absence.

 A prince satisfactorily decided a dispute between two women, each alleging herself to have borne the same child, but a child, if he ean tell what father beg it him, must be wiser thin Solo non. the mother, in such a case, must be wiser titan either of them, why she might not be. a witness in it perhaps no good reason ean be given, the lineaments of the child itself in some instances, e. g. resemblance of one nr other, or of the acknowledged children of one or other husband might qualify the child, in propria persona to prove the mutter in ques-ti m. when a minan pmcoosul of Sicily said toa man of that country, ‘i canliot account, for the extact si nilitude between me and thee, since my father was never in this province;’ the Sicilian, revenging the insult on h s motiléis ehasticy audacius qunm viraris et securilms subjecto conveniebat, as Valerius Maximus observes, petulantly retorted, ‘but my fithet went frequently to Rome.’

 In the reign of Edward the sixth, Charles duke of Suffolk having issue a son by one venter, and a daughter by another venter, made his last will, wherein he devised goods to his son. and died; after whose death the son died also; but witt'out will, without wife, and without child — his mother and his sister by the father side (for she was born of the firmer venter) then living.— the mother took the administration of her s ins goods, accorling to the statute of the 21st of Harry the eight, whereuy it is enacted, that in case any person die intestate, the ad n ntstratiun of his goods shall be com nitted to the next of kin.
The administration being thus ^surreptitiously) grauied to the mother, the sister by the lathers side commenced a suit before the ecclesiastical judge, alleging, 1, that she hemelf was next of kin, and 2, that the mother was not of kin at all to the party deceased ; and therefore prayed the court, that the administra *230 tion granted to the mothpr might be revoked, and be committed unto her as next of kin to the deceased, by fence of the said statute.
Hereupon, as it was a ureat cause, and much depending upon its issue — and many causes of great pr. perty likely to be decided in times to come, by ihe precedeni t.o be then made — the must, learned, as well in the laws of this realm, as in the civil law, were consul.ed togeth. r. whether the mother was of kin to her sun or no. — whoreunlo not only the temporal lawyers — but the church lawyers, the juris consult! — the juris prudentes — 'he civi ians — the advocates — the commissaries — the judges of t' e consistory and prerogative courts of Canterbury and York, with the master of the f-cubies, were all unanimously of opinion, that the mother was nut of kin to her child.’

 Cic. fam. IX. 18. Acad, i. 4.

 If Philip was eldest son of William Aylett, this was the principal case.’

 When an admirer of Croke lately said, ‘his bonks were the best extant,’ one, to whom this eulogy was r-ported. observed upon it, ‘that men of the lavir found the cases collected by that author as useful as belligerent nations find swiss s Idiers, who will fight fi.r either of opposite parlies;’ and,this observation seems verified in this case of Rose versus Bártlett.

 John Locke, in his essay for the understanding of saint Pauls epis'les, by consulting saint Paul himself, observed, that sober inquisitive readers of those epistles, who had a mind to Sre nothing in them but just what, the author meant, would not find the understanding of them, difficult; whereas others could See in them what they pleased.
A turkish traveller, introduced into the Vatican) when the librarian shewed the shelves on which were arranged the books relating to theology, the polyglot's, paraphrases, commentaries, translations, histories, connections, homilies, sermons, decrees of councils, polemical tracts, and many more, written in order to explane the Christian bible, said, ‘i suppose then after all this, every part of your bible must be well understood.’ ‘quite the reverse, answ'ered the. librarian, controversies have multiplied from that cause.’ whether controversies have increased or diminished by the great number of adjudications in cases where interpretations of testaments have been in question the reporter of the principal case will not pretend tn decide; hut he doth verily helieve that in 1793, if the .case of Rose verms Baulett, which was discussed more than 160 years'before, had never been published, no man would have thought whether William Aylett mraned to give all the land to which in Kingwilliam county he had any kind of right to his son Philip Aylett, a controvertible question.